# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,

      Plaintiff,

                                    Crim. Case No: 19-20821

v.                                  Hon. Nancy G. Edmunds

D-4 NABIL CHEHADEH,

      Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant, Nabil Chehadeh, was an active participate in a pharmaceutical coupon billing fraud scheme that caused losses in excess of $46,000,000.  The defendant owned multiple sham "pharmacies," personally submitted fraudulent coupons on behalf of those pharmacies, and regularly cashed checks issued by co-pay vendors.  Despite sitting down with the government to discuss his own involvement and the involvement of others in the scheme, and even despite pleading guilty, the defendant has now chosen to flee the country and, by all accounts, has no intention of returning.

Considering his overall culpability and his post-plea conduct, the government respectfully recommends a sentence of 10 years in custody.

## I.    Factual and Procedural History

The United States adopts the timeline of relevant case events, the description of the charge to which Defendant Chehadeh has pleaded guilty, and the statement of the offense conduct detailed by the Probation Department in the Revised Presentence Investigation Report (PSR) dated January 7, 2022.

## II.    Sentencing Guideline Calculations and Relevant 3553(a) Factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered to impose a sentence "sufficient, but not greater than necessary" to promote the objectives of sentencing: Those objectives include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from additional crimes by the defendant, and provide the defendant with needed training, care, or correctional treatment. To those ends, the Court should consider: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need to provide just punishment and adequate deterrence; (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5)

Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities (nationwide) among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims.

But sentencing starts with the calculation of the Guidelines range in order to promote the sentencing goals of Congress, namely to "provide certainty and fairness in meeting the purposes of sentencing, while avoiding unwarranted sentencing disparities[.]" *United States v. Booker*, 543 U.S. 220, 264 (2005). Indeed, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly. . . . The more out-of-range sentences that judges impose, the more disparity there will be." *United States v. Elliot*, 327 F. App'x 540, 549 (6th Cir. 2009).

A.    The Sentencing Guidelines

Pursuant to Rule 11, the parties agreed to certain sentencing enhancements including: a loss between $9,500,000 and $25,000,000 and more than ten victims. The Probation Department agreed with the parties. (PSR ¶ 27-29).  This results in an offense level of 29.

Although the parties initially contemplated a 3-point reduction of acceptance of responsibility, the government believes that this

reduction should be *wholly negated* by the defendant's choice to abscond from the jurisdiction prior to sentencing.  *See* USSG §3E1.1, App. Note 4.  Likewise, the government believes that the defendant's flight should trigger an additional 2-point increase under the Obstruction of Justice Guideline. *See* USSG §3C1.1, App. Note 4(E).  Factoring in the additional two points for obstruction (and excluding the full three-point reduction for acceptance of responsibility), the government believes the Total Offense Level should be 31.

The PSR also determined that Chehadeh falls into Criminal History Category I (PSR ¶ 39), and the government agrees with that scoring.

Accordingly, the government believes that the applicable sentencing guideline range should be 108-135 months in custody. The government is seeking the maximum permissible sentence under the parties' Rule 11 plea agreement, i.e., a sentence not-to-exceed the 121-month mid-point of that range.

B.    Section 3553(a) Factors

In this case, the most significant factors are the seriousness of the offense, and the need to deter Chehadeh and others from engaging in

fraud. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (C).

### (1) *Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

Beginning in the summer of 2014 (with the loaning of ~$20,000 to co-defendant Mohamad Abou-Khodr, who used the money to establish the first pharmacy) and continuing through the date of his arrest in 2019, Chehadeh operated at the center of an extensive fraud scheme. Unlike Bahia Zeidan, a co-defendant that was sentenced to probation by Judge Tarnow, Chehadeh was fully aware that his pharmacies would be open in name only, and the real purpose of the pharmacies was to steal millions of dollars by submitting completely fraudulent co-pay assistance reimbursement claims. All of the money that Chehadeh deposited into his pharmacy bank accounts was fraud proceeds.

Chehadeh's involvement in the offense was extensive—to date, he is the most culpable defendant to be sentenced. He owned or was personally connected to the "operation" of at least five pharmacies: Dart RX, Downriver RX Pharmacy, Med Health Pharmacy, Metro RX Pharmacy, and Wellmart Pharmacy—he scouted pharmacy locations; he leased locations in his own name; he was present for licensing inspections; and he collected and deposited the reimbursement checks.

5

Chehadeh was also directly involved in submission/billing of the fake claims; he made up patient names, dates of birth, and addresses, and then matched them with prescriptions. But unlike the purported patients, the prescribing physicians included with each fake claim were real. In order for the claims to go through, Chehadeh had to provide the name and identifier of a licensed medical practitioner. The processing software then validated that the prescriber's license was in good standing at the time the purported prescription was entered. The doctors did not know that their information was being used to commit fraud. Chehadeh and his co-defendants stole identifying information from unsuspecting physicians each and every time they submitted a fake claim.

Further, Chehadeh has chosen to flee the jurisdiction in a misguided attempt to avoid punishment for his crimes.  He leaves behind his spouse and three minor children.

### (2) *Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment*

The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment are factors that weigh in favor of a significant custodial sentence.

Put simply, this scope of this fraud scheme is staggering—a total of *at least* $46 million dollars in fraudulent billings. It is difficult to comprehend that large of a loss. $46 million is approximately the gross domestic product of Tuvalu[1], an island nation in the South Pacific with more than 11,000 people. This case currently has 11 defendants. Together, these 11 individuals managed to steal the equivalent of the GDP of a small nation, albeit not in a single year. Suffice it to say, this is a far cry from the typical wire fraud case seen in this district. The scheme was incredibly sophisticated, exploiting multiple loopholes in the prescription billing industry and leveraging the stolen PII of dozens of prescribing physicians in Michigan and Florida. The defendants created hundreds of phantom patients, generating thousands of false claims, and defrauding any and every coupon-assistance program they could find. The defendants then selected which drugs to bill by referring to detailed tables created by Hussein Abdallah, which itemized classes of medication by medical specialty. The defendants took care to ensure that no individual "patient" would be in the system with multiple, conflicting prescriptions for any given condition. The scheme was

---

[1] *See* The World Bank, https://data.worldbank.org/indicator/NY.GDP.MKTP.CD (reporting Tuvalu's 2020 GDP as $48.86 million in USD), last accessed March 3, 2022.

specifically designed to fly under the radar of regulators and industry compliance professionals.

This well-oiled operation worked for years. But when some defendants—to include Chehadeh, who once purportedly billed upwards of 100 coupons for a single drug—started to over-bill and draw the attention of third-party payers, the defendants played a grown-up game of whack-a-mole, cycling through multiple "pharmacies" in a single location, changing out "owners" on paper in a bid to further evade detection and prolong the scheme.

Each of the pharmacies in this case was also fully-established—on paper—as a legal pharmacy. This required buying or leasing a physical space, convincing a licensed pharmacist to act as the "PIC" or pharmacist-in-charge, applying for multiple identification numbers, executing numerous contracts with third-party billers, an in-person site inspection conducted by the State of Michigan, and the licensing and installation of the SRS billing software. The defendants even had a common office space—Ideal Business Resources—where the co-conspirators would meet up to submit fraudulent billings for multiple pharmacies together.

This scheme needs to be treated like the sophisticated business operation that it was, and the participants need to be punished accordingly.

(3) *The Need for Deterrence*

The above considerations impact another § 3553(a) factor – the need to deter such conduct in the future. Sentencing in the federal system has long contemplated the ability to provide both specific and general deterrence. *United States v. Phinazee*, 515 F.3d 511 (6th Cir. 2008); *United States v. Blackwell*, 459 F.3d 739, 774 (6th Cir. 2006).

Deterrence, specifically in the white-collar crime context, is extremely important. It is impossible to measure whether individuals are deterred by criminal prosecutions and sentences. In general, individuals that are deterred from committing crime do not come into contact with the courts. But common sense tells us that deterrence is valuable, and that low or non-custodial sentences, especially in white collar cases where the loss amount is staggering, serve to embolden other potential criminals to break the law. This principle is equally applicable in cases where defendants have fled the jurisdiction—there need to be additional consequences in order to deter other defendants from attempting to flee.

Crime trends support this commonsense conclusion. In the last several years, there has been a clear trend involving organized crime gangs transitioning their criminal enterprises from trafficking in controlled substances to white collar crime. Financial crimes are equally, if not more, profitable than selling drugs and the penalties are, in general, substantially lower.

In addition, the criminal conspiracy in this case was large. To date, 11 defendants have been indicted. But many more were involved in opening the pharmacies and submitting claims, and some have not yet or may not ever be charged. Those individuals that had a minor role in this scheme may be tempted to fill the void left by the prosecution of Chehadeh and others. If Chehadeh and his co-defendants do not go to jail and serve significant sentences, their acquaintances and associates will surely see no reason not to commit large scale pharmacy fraud. Consequences are crucial to deterring crime. Chehadeh's sentence should serve as a warning to others considering engaging in this type of fraud.

(4) *Restitution, Fines, and Forfeiture*

The defendant's crimes caused financial losses to numerous private companies.  Accordingly, pursuant to the Mandatory Victim

Restitution Act, 18 U.S.C. § 3663A, the government requests that

Chehadeh's judgment include the following restitution order, in the

total amount of **$11,916,283**:

- AlphaScrip                                           $92,035
- Change Healthcare                                    $559,018
- Emdeon                                               $2,011,353
- EPIC Pharmacy Network                                $5,289,184
- McKesson                                             $2,510,815
- Opus Health                                          $216,376
- PDMI                                                 $871,361
- Pfizer                                               $65,127
- SimpleSaveRx                                         $30,435
- Scientific Retail Systems (SRS)                      $270,579

The above companies are either third-party entities that processed

co-pay reimbursement claims from Chehadeh's pharmacies on behalf of

pharmaceutical manufacturers or, in the case of Pfizer, a pharmaceutical

manufacturer that is requesting direct restitution for its losses (Note: to

prevent double-counting, the restitution due to PDMI was off-set by the

amount of restitution requested by Pfizer).

The government also requests the Court impose a forfeiture money

judgment in the amount of $455,657.99 (as agreed in the parties' Rule 11

plea agreement), representing the amount of the fraudulent proceeds the

defendant personally obtained. Likewise, the government requests that

the Court order the forfeiture of 6046 Rosetta Street, Dearborn Heights,

MI (again, as agreed-to in the Rule 11 plea agreement) which was paid

for in part with fraud proceeds.

## III.  CONCLUSION

The United States respectfully requests that the Court impose a

middle-of-the-guidelines sentence of 10 years (120 months) in custody,

and order restitution as described above.

Respectfully Submitted,

DAWN N. ISON
United States Attorney

*s/Ryan A. Particka*
Ryan A. Particka
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
Date: August 10, 2022                  (313) 226-9635

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2022, I filed the foregoing document using the Court's CM/ECF system, which will send notice to counsel of record, Steven Fishman.

s/Ryan A. Particka
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9635
Ryan.particka@usdoj.gov

Date: August 10, 2022