## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                Crim. Case No: 19-20821

v.                                  Hon. Nancy G. Edmunds

D-10 SUZAN BERRO,

        Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

In the waning phase of a prolific, multi-year, multi-million-dollar fraud scheme, defendant Suzan Berro spent approximately twelve months working as a <u>biller</u>—*the* essential role when it comes to making money.  While she was nowhere near the most culpable member of the conspiracy, her conduct was what enabled the scheme to remain profitable. And what she was doing was so clearly, obviously fraudulent that even a twenty-year-old college student should have known better.

In order to appreciate the significance of that conduct, it is important to remember what "billing" means:  creating fake patients using names and addresses taken from real estate listings; making up their dates of birth; building a profile of medications using detailed drug

1

lists; finding coupons for those medications online; choosing doctors for each "prescription" (based on the correct specialty for each drug); and submitting a false claim for reimbursement.

Berro did this for <u>multiple</u> pharmacies—trial evidence linked her to roughly a third of the total number of entities—at a time when the coupon processors were quickly catching on and stopping payment, and her own texts confirm that she knew about this increased scrutiny. Across multiple months in 2019, Berro expended real, concerted, and ever-greater effort to keep up with the ever-more-elusive quotas set by more culpable members of the scheme.

Nevertheless, considering her overall culpability and various mitigating circumstances, the government respectfully recommends that the Court vary downward from the guidelines and impose a sentence of three years (36 months) in custody.

## I.    Factual Background

The evidence presented at trial can be summarized as follows:

Beginning in approximately July 2014 and continuing through December 2019, in the Eastern District of Michigan and elsewhere, D-1 Hussein Abdallah, several members of his family, and certain other

individuals acquainted with them (to include D-10 Suzan Berro, beginning in or around December 2018) knowingly executed and attempted to execute a scheme to defraud pharmaceutical companies to obtain money by means of materially false and fraudulent pretenses, representations, and promises.

Central to the scheme was the knowledge that the coupon claims submitted to "co-pay assistance programs" offered by pharmaceutical manufacturers were processed without any independent verification of whether the (1) patient was real; (2) the prescription was real; or (3) the prescription was even *filled*.

While certain of the pharmacies at the very beginning were doing at least some legitimate business, the scheme evolved to rely on paper-only pharmacies that never opened to the public nor dispensed any medications. This allowed for a very lucrative process wherein high-dollar prescription "reimbursements" could be submitted without ever ordering any inventory; the reimbursement claims the defendants submitted were entirely fictitious, right down to the patients themselves. Claim checks for two-week billing cycles could be as high as several hundred thousand dollars per pharmacy location.

The scheme included at least 37 different "pharmacies"—several of which used the same physical addresses as prior pharmacies that were shut down under suspicion of fraud. The losses are astounding and now believed to be in excess of $65M.

Berro's involvement was limited, but essential to the profitability of the endeavor in its final months.  She was initially recruited by her brother-in-law/father-figure/co-defendant, D-6 Bassem Farhat, to work as a pharmacy technician as a teenager.  This was a job, as described by Berro's own defense witness, where they were essentially paid to do nothing; it was during a phase of the conspiracy when certain pharmacies were open for business (and thus had to be staffed), but the volume of actual patients was vanishingly low.  Even so, it was during this time as a technician that she was taught how to use the SRS system, which could be used to submit both legitimate and illegitimate prescription claims. While it is possible that Berro discovered the scheme at that time—other similarly situated individuals, both charged and uncharged, certainly did—there is no way of knowing that for certain.

What is known though, is that Berro was brought back for the explicit purpose of doing the billing for Farhat's pharmacies sometime in late 2018, likely in December. Her billing activity was supervised by D-9 Linda Fawaz, and they both received direction from D-1 Hussein Abdallah as to (1) how to create fake patients, and (2) how much to bill for a given cycle. Berro frequently texted with Fawaz, seeking confirmation that she had "billed enough" and asking whether certain processors were still "working" (i.e., accepting claims). Two examples of these messages appear below.



As time went on, Berro's role expanded to include billing for non-Farhat pharmacies. Fawaz also stated that sometime in the spring or summer of 2019 she (Fawaz) scaled back her own personal billing activity, and that Berro picked up the slack.

At the time of the takedown in December 2019, two pharmacy laptops (pre-loaded with the SRS software) and a personal laptop (identified at trial as being Berro's) were located in a backpack believed to belong to Berro, along with notes and other documents pertaining to the fraud—certain of which contained notes that Fawaz recognized to have been written in Berro's handwriting.

 The government believes that Berro billed for at least eleven pharmacies (Local Pharmacy, Cedar Pharmacy, Fraser RX Pharmacy, Dalcoma RX, RX Mart, Hollywood Pharmacy Group, Metro RX, Crittenton RX, Grand Rapids RX, Commerce Family Pharmacy, and Ritemed), and that the evidence shows a connection between Berro and at least two others (Pro Med and Family Drug). Collectively, these thirteen pharmacies received $3,601,347 as a result of fraudulent claims paid out ***__after January 1, 2019__***; i.e., after Berro herself began submitting claims. The government submits that all of these losses

were at least foreseeable to her, with her likely having a hand in causing a significant portion of them (while also undoubtedly being aware of still other pharmacies involved in the scheme).

## II.    Procedural History

On August 26, 2020, a thirty-six-count Superseding Indictment was returned by a grand jury in the Eastern District of Michigan charging Berro and ten others with Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. § 1349; Wire Fraud in violation of 18 U.S.C. § 1343; and various related offenses.[1]  Berro herself was charged in two counts: Count One (the conspiracy) and Count Ten (wire fraud). Apart from Berro, all of the defendants who were arraigned on the indictment[2] pleaded guilty.

On January 13, 2023, following a two-week trial presided over by this Court, a jury found the Defendant guilty of both counts in which she was charged.

---

[1] This First Superseding Indictment added one defendant and additional counts against certain other defendants.  The charges against Berro remained unchanged from the initial Indictment, filed on December 12, 2019.
[2] Defendant-2 Mohammad Abou-Khodr and Defendant-11 Mohammad Charaf remain fugitives from justice, and are currently believed to be residing in Lebanon.

### III. Sentencing Guideline Calculations and Relevant 3553(a) Factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered to impose a sentence "sufficient, but not greater than necessary" to promote the objectives of sentencing: Those objectives include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from additional crimes by the defendant, and provide the defendant with needed training, care, or correctional treatment. To those ends, the Court should consider: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need to provide just punishment and adequate deterrence; (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities (nationwide) among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims.

But sentencing starts with the calculation of the Guidelines range in order to promote the sentencing goals of Congress, namely to

"provide certainty and fairness in meeting the purposes of sentencing, while avoiding unwarranted sentencing disparities[.]" *United States v. Booker*, 543 U.S. 220, 264 (2005). Indeed, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly. . . . The more out-of-range sentences that judges impose, the more disparity there will be." *United States v. Elliot*, 327 F. App'x 540, 549 (6th Cir. 2009).

A. The Sentencing Guidelines

The Probation Department in the Presentence Investigation Report ("PSR") calculated a total offense level as follows:

- Base offense level of 7 for Conspiracy to Commit Wire Fraud, and Wire Fraud in violation of 18 U.S.C. §§ 1349 and 1343 (USSG § 2B1.1(a)(1))

- 18 points for loss greater than $3,500,000, but less than $9,500,000 (USSG § 2B1.1(b)(1)(J)).

- 2 points for the offense involving ten or more victims (USSG §2B1.1(b)(2)(A)(i)).

- 3 points removed for a mitigating role (USSG §1 3B1.2(b)).

9

The government largely agrees[3] with the Probation Department's calculations, and accepts them for purposes of sentencing. This gives a Total Offense Level of 24.

Berro has no prior criminal convictions, which places her in Criminal History Category I (PSR ¶ 39).

Accordingly, the government believes that the applicable sentencing guideline range should be 51-63 months in custody. However, because of the likelihood that the guidelines overstate the defendant's personal culpability, the government is seeking a sentence of three years (36 months) in custody.

B.   <u>Section 3553(a) Factors</u>

In this case, the most significant factors are the seriousness of the offense, and the need to deter Berro and others from engaging in fraud. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (C).

---

[3] Although the government views the third-point reduction (for defendants whose culpability falls between "minor" and "minimal" participant) as excessive in light of the definitions given to those terms by the guidelines and the government's understanding of Berro's role, the disagreement is purely academic given the government's ultimate recommendation.

### (1) *Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

Beginning at least as recently as December 2018 (and possibly sooner), defendant Suzan Berro played a critical role in the final year of a staggeringly successful fraud scheme:  she billed.  When distilled down to that simple concept, it feels rather innocuous.  But as stated previously, 'to bill' means 'to make up literally everything.' She did so by using real estate lists, and drug lists, and coupons she found on the internet; from those lists she herself selected which drugs to bill; she made up birthdates; and she personally selected the doctors she was attesting had written the "prescriptions" for which she was billing.

None of it was real.  Except for the doctors. In order for the claims to go through, Berro had to provide the name and identifier of a licensed medical practitioner. The SRS software then validated that the prescriber's license was in good standing at the time the purported prescription was entered. The doctors did not know that their information was being used to commit fraud. Berro and her co-defendants stole identifying information from unsuspecting physicians each and every time they submitted a fake claim.

And she didn't do this for just one pharmacy, no—by the government's count she did it for ***at least eleven***.  Each had their own laptop, of which she would at times be holding on to multiple. She billed remotely (sometimes from home, other times from the back room of a random office building), never in an actual pharmacy with real patients. She billed to meet <u>quotas</u>, not to clear the queue of actual prescriptions that had been filled. She billed one processor until it "stopped" before switching to another, which occurred more and more frequently during that final year.  She billed Linda Fawaz's slack when the reality of Fawaz's own criminal conduct caught up to her.  Simply put, Berro knew exactly what she was doing the entire time she was billing, and she is now hoping to evade responsibility for it.

The defense will likely focus on:  (1) the fact that she was "young" [except that she was in college, studying nursing]; (2) that she was brought into this by her father-figure Bassem Farhat [as though she was not already aware her own parents had gone to federal prison for fraud (and thus she should have known better), or that she didn't benefit from the lifestyle improvements that came with living in Farhat's house during the height of the scheme]; and (3) that she

somehow thought this was a legitimate job [even though no one <u>ever</u> saw her with an actual prescription or doing any legitimate billing and she didn't receive regular paychecks].

Berro began billing during the scheme's final year of existence, at a time when processors were catching on faster and faster. As a function of this, Berro touched roughly *one third of the total pharmacies* involved in the scheme. That breadth alone speaks to knowledge of what was really going on. As do her texts about 'how much she billed,' when she can 'move on to the next computer,' and which processors had "stopped" accepting claims for which pharmacies. She was anything but a bystander in all of this.

The government appreciates that this was not her scheme, and that she did not personally profit from it to the same degree as the most-culpable owner-defendants.[4] Unfortunately for her, none of that

---

[4] Berro was never an owner with a direct profit-sharing stake in any of the pharmacies. However, Berro was given the use of an SUV, lived in Farhat's house, and took at least one trip with him to Lebanon. In all candor though, it is impossible to know exactly how much compensation she received from Farhat— in-kind or otherwise—because (1) they lived together, (2) Farhat was responsible for paying her, (3) he is known to deal routinely in cash, and (4) there was no discernable "payroll" reflected in any of the bank records.

excuses her conduct.  Choices have consequences.  And the consequence here should be three years in the custody of the Bureau of Prisons.

### (2) *Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment*

The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment are factors that weigh in favor of a significant custodial sentence.

Put simply, this scope of this fraud scheme is staggering—a total of more than $65M in fraudulent receipts.  In a co-defendant's sentencing memorandum, undersigned counsel previously compared an earlier estimate of the total loss to the gross domestic product of Tuvalu, a small island nation in the South Pacific.  Without belaboring the point, this was a ridiculous amount of fraud.

The scheme was incredibly sophisticated, exploiting multiple loopholes in the prescription billing industry and leveraging the stolen PII of dozens of prescribing physicians. The defendants created hundreds of phantom patients, generated thousands of false claims, and defrauded any and every coupon-assistance program they could find. The defendants then selected which drugs to bill by referring to detailed tables created by Hussein Abdallah, which itemized classes of

14

medication by medical specialty. The defendants took care to ensure that no individual "patient" would be in the system with multiple, conflicting prescriptions for any given condition. The scheme was specifically designed to fly under the radar of regulators and industry compliance professionals.

This well-oiled operation worked for years. But when some defendants started to over-bill and draw the attention of third-party payers, the defendants took to playing a grown-up game of whack-a-mole, cycling through multiple "pharmacies" in a single location, changing out "owners" on paper in a bid to further evade detection and prolong the scheme. Berro joined the scheme during this final phase; while she is not responsible for all of machinations at play, she took part in them none the less, billing for one pharmacy after another until the processors stopped paying and the defendants got arrested.

This scheme needs to be treated like the sophisticated business operation that it was, and the participants need to be punished accordingly. Including Berro. While a guideline sentence may be excessive, the seriousness of the scheme itself calls for time in custody.

(3) *The Need for Deterrence*

The above considerations impact another § 3553(a) factor – the need to deter such conduct in the future. Sentencing in the federal system has long contemplated the ability to provide both specific and general deterrence. *United States v. Phinazee*, 515 F.3d 511 (6th Cir. 2008); *United States v. Blackwell*, 459 F.3d 739, 774 (6th Cir. 2006).

Deterrence, specifically in the white-collar crime context, is extremely important. It is impossible to measure whether individuals are deterred by criminal prosecutions and sentences. In general, individuals that are deterred from committing crime do not come into contact with the courts. But common sense tells us that deterrence is valuable, and that low or non-custodial sentences, especially in white collar cases where the loss amount is staggering, serve to embolden other potential criminals to break the law.

Crime trends support this commonsense conclusion. In the last several years, there has been a clear trend involving organized crime gangs transitioning their criminal enterprises from trafficking in controlled substances to white collar crime. Financial crimes are

equally, if not more, profitable than selling drugs and the penalties are, in general, substantially lower.

In addition, the criminal conspiracy in this case was large. To date, 11 defendants have been indicted. But many more were involved in opening the pharmacies and submitting claims, and some have not yet been (or may never be) charged. Those individuals that had a less central role in the scheme and have thus far evaded prosecution may be tempted to fill the void left behind by these defendants. If Berro and her co-defendants do not go to jail and serve significant sentences, their acquaintances and associates will surely see no reason not to commit large scale pharmacy fraud. Consequences are crucial to deterring crime.

This deterrence principle also necessarily extends to the less-culpable defendants who, although not calling the shots, drive the machine forward through their collective efforts. Fraud schemes like this one only function (and persist) because the most-culpable defendants are able to recruit others to do the actual work of building patient profiles and submitting coupon claims. Berro's sentence should

serve as a warning to others considering engaging in this type of fraud—to any degree.

Giving Berro a pass would send a terrible message:  essentially, there's no need to accept responsibility or show remorse, regardless of how much money you helped steal, because you won't go to jail anyway. A probationary sentence for a biller like Berro is a fraud-scheme "help wanted" ad waiting to happen.  A guideline sentence is greater than necessary under the circumstances, but some period of incarceration is necessary for appropriate deterrence.

(4) *The need to avoid unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct*

Four of Berro's co-conspirators have already been sentenced, and while two received non-custodial sentences, it is important to remember that both of them *accepted responsibility*, and one of them testified against Berro:

- On January 4, 2022, co-conspirator Bahia Zeidan was sentenced by the late Honorable Arthur J. Tarnow to one day in custody (with credit for time served), following a plea to one count of wire fraud. Zeidan's guideline range was 27 months to 33 months.  Zeidan was recruited to be a straw owner of one pharmacy, after having been a pharmacy tech; she expressed immediate remorse.

- On March 15, 2022, co-conspirator Ali El-Moussawi was sentenced by this Court to 36 months in custody, following a plea to conspiracy.  El-Moussawi's guideline range was 41 months to 51 months. He was the partial owner of six pharmacies, and did significant billing himself.

- On August 15, 2023, co-conspirator Nabil Chehadeh was sentenced by this Court to 72 months in custody, following a plea to conspiracy. Chehadeh's guideline range was 63-78 months. He owned five pharmacies.  Chehadeh was sentenced in absentia and remains a fugitive.

- On January 23, 2023, co-conspirator Linda Fawaz was sentenced by this Court to 3 years' probation, following a plea to one count of wire fraud.  Fawaz's guideline range was 21-27 months.  Fawaz was a straw owner of one pharmacy.  At the direction of Hussein Abdallah, Fawaz did the majority of the paperwork necessary to open new pharmacies; she also did billing for multiple pharmacies and supervised Berro's billing.  Fawaz was incredibly remorseful, all-but-withdrew from the conspiracy in mid-2019, and ultimately testified against Berro.

Considering the facts as a whole, Berro is *most similar* to Ali El-Moussawi.  El-Moussawi was, essentially, a biller who was given a profit-sharing stake in certain pharmacies because he was part of the family.  Although Berro was <u>not</u> an owner of any pharmacies, she did the billing for a large number of them; her overall compensation is also a black box, as noted above.

Further, according to the U.S. Sentencing Commission's Judiciary Sentencing Information Network (JSIN):

> During the last five fiscal years (FY2017-2021), there were 401 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 24 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 391 defendants (98%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 41 month(s) and the median length of imprisonment imposed was 42 month(s).

(https://jsin.ussc.gov/analytics/saw.dll?Dashboard, last visited May 8, 2023).  Given the overwhelming percentage of defendants in this cell who received a custodial sentence of some length (98%), and the average and median sentences imposed, the government believes that the departure recommended here will serve to ensure uniformity among similarly situated defendants far better than either (1) a shorter term of incarceration, or (2) a wholly probationary sentence.

(5) *Restitution, Fines, and Forfeiture*

The defendant's crimes caused financial losses to numerous private companies.  Accordingly, pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, the government requests that Berro's judgment include the following restitution order, in the total

amount of **$3,601,347.00**, payable jointly and severally with her co-defendants.

| | |
|---|---|
| AstraZeneca | $ 1,181,305.82 |
| Eli Lilly & Co | $ 587,019.56 |
| Allergan Inc (now AbbVie) | $ 457,371.07 |
| Bausch Health | $ 277,303.72 |
| Astellas Pharma | $ 270,101.03 |
| Otsuka America | $ 208,878.13 |
| Pfizer Inc., | $ 171,000.00 |
| Novartis | $ 169,263.31 |
| Horizon Therapeutics | $ 109,841.08 |
| Resilia Pharma | $ 72,026.94 |
| Abbvie US LLC | $ 57,621.55 |
| Horizon Pharma | $ 39,614.82 |

The figures above account <u>only</u> for claims that were paid beginning in January 2019, after Berro unquestionably joined the conspiracy. Further, these figures are only for claims paid to pharmacies that were connected to Berro via evidence introduced at trial.

## IV.   **CONCLUSION**

The United States respectfully requests that the Court impose a

below guidelines sentence of 3 years (36 months) in custody, and order

restitution as described above.

Respectfully Submitted,

DAWN N. ISON
United States Attorney

*s/Ryan A. Particka*
Ryan A. Particka
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9635

Date: May 8, 2023

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 8, 2023, I filed the foregoing document

using the Court's CM/ECF system, which will send notice to counsel of

record, William W. Swor.

<u>*s/Ryan A. Particka*</u>
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9635
Ryan.particka@usdoj.gov

Date: May 8, 2023