UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                          Crim. Case No: 19-20821
v.                                         Hon. Nancy G. Edmunds

D-6 Bassem Farhat,

        Defendant.

_____/

**GOVERNMENT'S SENTENCING MEMORANDUM**

Bassem Farhat will likely attempt to convince this Court that aside from a few specific pharmacies owned in his own name, he was "just the accountant." That's tantamount to an architect saying they 'just drew up the plans'—it takes the sense of agency out of the role. Sure, he was *an* accountant, but that was simply one aspect of his role as the scheme's financial consigliere, optimizing and professionalizing the operation to devastating effect. Given his level of influence and involvement across the entire scheme, the government respectfully recommends a sentence of 87 months in custody—the mid-point of the guideline range and the maximum allowed under the plea agreement.

1

I.     Factual Background & Procedural History

The United States agrees with the timeline of relevant case events, the description of the charge to which Defendant Farhat has pleaded guilty, and the statement of the offense conduct detailed by the Probation Department in the Revised Presentence Investigation Report (PSR) dated March 7, 2023.

Bassem Farhat was not one of the founding members of this prolific, multi-year, multi-million-dollar fraud scheme but having noticed the substantial sums of money that Hussein Abdallah and Mohamad Abou-Khodr were bringing into New Boston RX, he was eager to get involved. Abdallah and Abou-Khodr initially hired Farhat to be their accountant (with Abdallah having used Farhat for his personal taxes as far back at 2012). The bank statements for New Boston RX presented a stark contrast to Abdallah's prior earnings, and Farhat expressed interest in a partnership with Abdallah and Abou-Khodr.

In June 2015, Farhat secured a physical location in Garden City for Pro Med Pharmacy and filed the Articles of Organization. The physical retail space was the first step in obtaining a pharmacy license. Farhat then applied for a pharmacy license to the State of Michigan in

which he claimed to be the sole owner. In reality, ownership was shared equally amongst Farhat, Abdallah and Abou-Khodr. The individual identified on the application as the pharmacist in charge was the same pharmacist recruited by Abdallah and Abou-Khodr to work at New Boston RX. The State of Michigan issued a license to Pro Med Pharmacy on December 14, 2015. Slightly more than a year later, Farhat hired his sister-in-law, Suzan Berro, and her friend, Miriam Hachem, to work at Pro Med Pharmacy when Berro was still a minor – not turning 18 years old until January 29, 2018. As Hachem testified at Berro's trial, it was the best job she ever had because she was paid for doing nothing. However, it is clear from the investigation that employees such as Berro and Hachem were <u>not</u> being paid for doing "nothing;" no, they were being paid to create the *appearance* that the pharmacy was doing legitimate business.

    Farhat's involvement went beyond his own pharmacies though, in that he was frequently responsible for the corporate documents—the Articles of Incorporation, sales agreements, and the like. This gave him a broad awareness of the scope of the fraud. In March 2015, Farhat signed the Articles of Organization for another pharmacy, Downriver

RX, listing Daniel Haidar (D-3) as the registered agent. On July 3, 2016, Farhat e-mailed Hussein Abdallah an unexecuted bill of sale transferring Downriver RX from Daniel Haidar to Nabil Chehadeh (D-4), doing business as First Aid Pharmacy. Around the same time, Farhat filed a change of registered agent form wherein Chehadeh replaced Hussein Abdallah's wife (who had been on the paperwork for a business in that name as far back as 2013) as the registered agent for First Aid Pharmacy. This "sale" appears to be the defendants' response to an onsite audit of Downriver RX conducted by UnitedHealthcare. The defendants had refused to provide dispensing records and wholesale/distributor records for the purpose of conducting a drug inventory reconciliation. This open-close strategy of dealing with audits proliferated across multiple pharmacies as time went on.

     This is because the pharmacies involved in this scheme never purchased the brand name drugs for which co-pay assistance reimbursement claims were submitted. Pharmacies opened near the onset of the conspiracy, such as Pro Med Pharmacy, had a small inventory of generic drugs and over-the-counter products, but that was all. During Berro's trial the Court heard testimony that Pro Med

4

Pharmacy and other pharmacies opened by the defendants had little if any legitimate customer traffic. Between April and November 2017, Pro Med Pharmacy submitted co-pay assistance reimbursement claims for one drug alone, Aplenzin, totaling $452,912. Because Aplenzin and other brand name drugs were never purchased, those reimbursement payments represented nearly half a million dollars of pure "profit."

It is hard to appreciate just how lucrative this fraud was. Many of the reimbursement payments for a two-week billing cycle were over $100,000. For example, between December 30, 2017, and May 5, 2018, one coupon processor issued five checks to Pro Med Pharmacy **each** greater than $100,000. The largest check was approximately $170,000 and the two smallest checks during that period were $95,003 and $96,726 for a total of $899,852 in just over four months.

The government will not recount all of the connections between Farhat and the other pharmacies identified in the PSR, other than that in each instance these connections are more than sufficient for the Court to find that the losses occasioned by those pharmacies were foreseeable to him and thus he should be held accountable for them. Likewise, for any specific pharmacy whose losses are challenged by the

defense, the government would direct the Court's attention to the government's responses to the defense objections, detailed in the Final PSR at ECF No. 296, PageID.1629-1639.

As an accountant, Farhat was also adept at *concealing* the substantial sums of money that he was receiving through the fraudulent co-pay coupon reimbursement claims. Oftentimes he transferred funds from the pharmacy bank accounts to other business accounts that he and his co-defendants controlled. He also leveraged his accounting relationships with other, unwitting individuals not at all involved in the pharmacies. Farhat appears to have used Excel spreadsheets to track his money laundering operations. A copy of one such spreadsheet was obtained in a search of Farhat's e-mail account. That Excel spreadsheet showed that between approximately September 2018 and June 2019 (during the height of the scheme), Farhat had paid out $449,460 on behalf of one client and received $450,500 in cash. The spreadsheet does not capture the entire scope of Farhat's operation though, as bank records showed payments on behalf of that client as early October 2017—almost a year before the first entry on Farhat's spreadsheet. Based upon these additional bank records, the amount

that Farhat laundered through this accounting client is likely over $750,000. This was not the only third-party listed in Farhat's Excel spreadsheet. Of significance, another individual had multiple entries between October 1, 2018, and May 17, 2019, indicating that the cash paid to Farhat was *received in Lebanon*. According to Farhat's records, he paid out at least $228,000 to this person and received approximately $218,000. And yet another individual received a combined $190,000 from Global Family Service (a shell company owned by Farhat) and Med Health Pharmacy. This third conduit is worth noting because several of the checks issued by their company as repayment to Farhat were made payable to Farhat's wife. Again and again, Farhat took steps to conceal and disguise the flow of funds coming in from the pharmacies, diversifying his "investment" and making the income appear legitimate.

Farhat himself was also directly involved in the fraudulent co-pay coupon reimbursement claims. The fraudulent billings involved taking names from real estate listings, making up a date of birth, downloading co-pay assistance coupons from the Internet, and selecting a doctor within the appropriate discipline (i.e. a psychiatrist for anti-depression

drugs). The FBI executed a search warrant at Farhat's residence in December 2019. In Farhat's residence, agents located a Wayne County Public Records report for 31525 Marquette Street in Garden City. At the bottom of the report, the name "M.L." and date "01/19/1966" were handwritten. Co-pay assistance reimbursement claims were submitted with this name and date of birth from Farhat's pharmacy, Pro Med Pharmacy. One of the reimbursement claims in M.L.'s name was for Epiduo and used coupon number 1192213382. Agents seized a coupon with that same number from Farhat's residence. The paper showed that the Epiduo coupon was printed on March 7, 2017, thirty-four minutes before the Epiduo prescription was purportedly filled according to the reimbursement claim data submitted.

It's also important to acknowledge, as the Court is well aware, that Farhat brought his younger sister-in-law (who regarded him as a father-figure) into the scheme in a real way sometime in late 2018. As the Court heard during Berro's trial, Farhat had not been pulling his weight with regard to the billings for his own pharmacies, and the solution he offered to Abdallah was to have Berro step-in and do the billing work on his behalf. The evidence at trial showed detailed

8

spreadsheets with "patient profiles" being emailed back and forth between them. But-for Farhat, Berro would not have been involved in the billing at all and would not have faced prosecution.

## II. Sentencing Guideline Calculations and Relevant 3553(a) Factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered to impose a sentence "sufficient, but not greater than necessary" to promote the objectives of sentencing: Those objectives include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from additional crimes by the defendant, and provide the defendant with needed training, care, or correctional treatment. To those ends, the Court should consider: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need to provide just punishment and adequate deterrence; (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities (nationwide) among defendants with similar records found guilty of similar conduct; and (7) the need to

9

provide restitution to victims.

But sentencing starts with the calculation of the Guidelines range in order to promote the sentencing goals of Congress, namely to "provide certainty and fairness in meeting the purposes of sentencing, while avoiding unwarranted sentencing disparities[.]" *United States v. Booker*, 543 U.S. 220, 264 (2005). Indeed, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly. . . . The more out-of-range sentences that judges impose, the more disparity there will be." *United States v. Elliot*, 327 F. App'x 540, 549 (6th Cir. 2009).

### A. The Sentencing Guidelines

Consistent with the parties' Rule 11 Plea Agreement (inclusive of the government's view of the "agree to disagree" provision regarding loss), the Probation Department in the Presentence Investigation Report ("PSR") calculated a total offense level of 28, and a criminal history category of I—this yields a range of 78 to 97 months in custody.

The government agrees with this calculation.

### B. Section 3553(a) Factors

In this case, the most significant factors are the seriousness of the offense, and the need to deter Farhat and others from engaging in

fraud. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (C).

### (1) *Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

If Hussein Abdallah can be said to have struck the match that ultimately burned a $65M inferno through myriad coupon reimbursement programs, Farhat was the one *stoking* that fire—using his knowledge of financial accounting to make sure that all of the necessary paperwork was completed quickly and correctly—and thereby giving the scheme the oxygen it needed to keep going for multiple years.

Farhat was also instrumental in moving significant sums of money around the various pharmacies and other entities.

He also involved his much younger sister-in-law, a fact that the government believes the Court finds especially significant.

### (2) *Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment*

The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment are factors that weigh in favor of a custodial sentence.

Put simply, this scope of this fraud scheme is staggering—a total of more than $65M in fraudulent receipts. The scheme was incredibly

11

sophisticated, exploiting multiple loopholes in the prescription billing industry and leveraging the stolen PII of dozens of prescribing physicians. Farhat's ability to keep the paperwork in order and handle the taxes allowed the machine to burn through pharmacy after pharmacy after pharmacy, even when processors began to clamp down on their ability to submit claims.

This scheme needs to be treated like the sophisticated business operation that it was; Farhat was largely responsible for that sophistication and should be punished accordingly.

### (3) *The Need for Deterrence*

The above considerations impact another § 3553(a) factor – the need to deter such conduct in the future. Sentencing in the federal system has long contemplated the ability to provide both specific and general deterrence. *United States v. Phinazee*, 515 F.3d 511 (6th Cir. 2008); *United States v. Blackwell*, 459 F.3d 739, 774 (6th Cir. 2006).

Deterrence, specifically in the white-collar crime context, is extremely important. It is impossible to measure whether individuals are deterred by criminal prosecutions and sentences. In general, individuals that are deterred from committing crime do not come into

contact with the courts. But common sense tells us that deterrence is valuable, and that low or non-custodial sentences, especially in white collar cases where the loss amount is staggering, serve to embolden other potential criminals to break the law.

Crime trends support this commonsense conclusion. In the last several years, there has been a clear trend involving organized crime gangs transitioning their criminal enterprises from trafficking in controlled substances to white collar crime. Financial crimes are equally, if not more, profitable than selling drugs and the penalties are, in general, substantially lower.

In addition, the criminal conspiracy in this case was large. To date, 11 defendants have been indicted. But many more were involved in opening the pharmacies and submitting claims, and some have not yet been (or may never be) charged. Those individuals that had a less central role in the scheme and have thus far evaded prosecution may be tempted to fill the void left behind by these defendants. If Farhat and his co-defendants do not go to jail and serve significant sentences, their acquaintances and associates will surely see no reason not to commit

large scale pharmacy fraud. Consequences are crucial to deterring crime.

This deterrence principle also necessarily extends to those in the professional services, who may encounter a scheme like this through the course of their legitimate work, only to later become tempted (and involved) themselves. Farhat's sentence should send a strong message that the correct course of action in that circumstance is <u>not</u> to use your skills to assist your clients to commit even more fraud.

> (4) *The need to avoid unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct*

Five of Farhat's co-conspirators have already been sentenced:

- On January 4, 2022, co-conspirator Bahia Zeidan was sentenced by the late Honorable Arthur J. Tarnow to one day in custody (with credit for time served), following a plea to one count of wire fraud. Zeidan's guideline range was 27 months to 33 months. Zeidan was recruited to be a straw owner of one pharmacy, after having been a pharmacy tech; she expressed immediate remorse.

- On March 15, 2022, co-conspirator Ali El-Moussawi was sentenced by this Court to 36 months in custody, following a plea to conspiracy. El-Moussawi's guideline range was 41 months to 51 months. He was the partial owner of six pharmacies, and did significant billing himself.

- On August 15, 2023, co-conspirator Nabil Chehadeh was sentenced by this Court to 72 months in custody, following a plea to conspiracy. Chehadeh's guideline range was 63-78 months. He

14

owned five pharmacies. Chehadeh was sentenced in absentia and remains a fugitive.

- On January 23, 2023, co-conspirator Linda Fawaz was sentenced by this Court to 3 years' probation, following a plea to one count of wire fraud. Fawaz's guideline range was 21-27 months. Fawaz was a straw owner of one pharmacy. At the direction of Hussein Abdallah, Fawaz did the majority of the paperwork necessary to open new pharmacies; she also did billing for multiple pharmacies and supervised Berro's billing. Fawaz was incredibly remorseful, all-but-withdrew from the conspiracy in mid-2019, and ultimately testified against Berro.

- On May 15, 2023, co-conspirator Suzan Berro was sentenced to one day in custody with credit for time served, followed by two years' supervised release. Berro's guideline range of 51-63 was significant and likely overstated her personal culpability; in recognition of that, the government recommended a sentence of 36 months.

Farhat is, by far, the most significant defendant to face sentencing—and in the government's estimation the most significant defendant to currently face prosecution save Hussein Abdallah (and fugitive co-defendant Mohamad Abou-Khodr).

Further, according to the U.S. Sentencing Commission's Judiciary Sentencing Information Network (JSIN):

> During the last five fiscal years (FY2017-2021), there were 192 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 28 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 190 defendants (99%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 63

month(s) and the median length of imprisonment imposed was 60 month(s).

(https://jsin.ussc.gov/analytics/saw.dll?Dashboard, last visited May 22, 2023). Given that virtually all the defendants in this cell received a custodial sentence (99%), and that the average sentence was five or more years, the government believes that a significant custodial sentence of *at least* that length is necessary in order to avoid unwarranted sentencing disparities.

(5) *Restitution, Fines, and Forfeiture*

The defendant's crimes caused financial losses to numerous private companies. Consistent with the government's view of the losses for which Farhat should be held responsible, we ask the Court to impose a restitution order in the total amount of $16,093,963, with a complete victim breakdown to be provided at the time of sentencing.

Further, the government would ask the Court to impose forfeiture consistent with the parties' Preliminary Order of Forfeiture and the Rule 11 Plea Agreement.

## III. CONCLUSION

The United States respectfully requests that the Court impose a custodial sentence of 87 months—the mid-point of the government's recommended guideline range—and enter orders providing for restitution and forfeiture, as described above.

Respectfully Submitted,

DAWN N. ISON
United States Attorney

*s/Ryan A. Particka*
Ryan A. Particka
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9635

Date: May 22, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2023, I filed the foregoing document using the Court's CM/ECF system, which will send notice to counsel of record, Patrick J. Hurford.

*s/Ryan A. Particka*
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9635
Ryan.particka@usdoj.gov

Date: May 22, 2023